UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CATHERINE F. SITCLER,                )                      | |
|                                                             ) | |
|         Plaintiff,                                 ) | |
|                                                             ) | |
|         v.                                              )    | CAUSE NO. 1:04-CV-00383 |
|                                                             ) | |
| JO ANNE B. BARNHART,                 ) | |
| Commissioner of Social Security,   ) | |
|                                                             ) | |
|         Defendant.                              ) | |

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court for review of the final decision of Defendant Commissioner of Social Security ("Commissioner"), denying Plaintiff Catherine F. Sitcler's application for Disability Insurance Benefits (DIB) and Supplementary Security Income (SSI) payments.[1]  For the following reasons, the Commissioner's final decision will be AFFIRMED.

**II. PROCEDURAL AND FACTUAL BACKGROUND**

*A. Procedural History*

On November 15, 2001, Sitcler applied for DIB and SSI benefits, alleging that she became disabled as of June 17, 2000.[2] (Tr. 125-27.)  Her claim was denied on initial consideration and reconsideration. (Tr. 79-86.)  Administrative Law Judge (ALJ) Dennis Kramer held a hearing on September 18, 2003, at which Sitcler, represented by her attorney, a vocational

---

[1]All parties have consented to the Magistrate Judge.  *See* 28 U.S.C. § 636(c).

[2]Sitcler previously applied for DIB and SSI benefits in August 2000 (Tr. 128-30); however, her claim was denied on initial consideration and reconsideration, and she did not request a hearing (Tr. 80-82).

expert, and Sitcler's friend testified. (Tr. 40-76.)  On April 28, 2004, the ALJ ruled that Sitcler was not disabled because she was able to perform her past relevant work and a significant number of other jobs in the economy. (Tr. 13-25.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Sitcler's request for review of the decision. (Tr. 7.)  Sitcler then filed this action, seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). (*See* Compl. ¶ 1.)

## B.  Facts[3]

Sitcler, who was thirty-two years old at the time of the Commissioner's final decision, alleges that she became disabled as of June 17, 2000.  Sitcler dropped out of high school after the ninth grade, but obtained her general education degree in 1995 on her fifth attempt at the examination.  More recently, Sitcler has taken college classes at Ivy Tech State College, completing as many as four classes per semester.  Her past occupational experience includes work as a food server, sales attendant and, most recently, document preparer.

While Sitcler suffers from multiple physical maladies, she does not dispute the ALJ's findings regarding her physical impairments.[4]  Rather, Sitcler solely claims that the ALJ improperly analyzed the opinion of her treating psychologist, Dr. Jason Cook, and thus failed to consider the impact of her anxiety problems on her ability to function.  The Court will therefore focus its inquiry on the ALJ's findings pertaining to Sitcler's mental condition and his

---

[3]The administrative record in this case is voluminous (620 pages); therefore, in the interest of brevity, and since the facts are undisputed by the parties, this opinion recites the facts without citation to the record, recounting only those portions of the record necessary to the decision.

[4]Sitcler alleges she suffers from the following impairments: chronic fatigue, low thyroid level, headaches, hot flashes, joint laxity, hyper mobility syndrome, carpal tunnel syndrome, posttraumatic stress disorder, anxiety, TMJ, allergies to various substances, irritable bowel syndrome, sleep disturbances, generalized body stiffness, painful menstrual periods, temperature sensitivity, memory problems, fetal alcohol syndrome, and a learning disability.

consideration of Dr. Cook's opinion.

On October 11, 2000, Dr. Donald Kramer, a clinical psychologist, performed a psychological evaluation of Sitcler at the request of the Disability Determination Bureau. In the evaluation, Sitcler told Dr. Kramer that she easily gets distracted and disorganized, does not concentrate well, has difficulty multi-tasking, and is a poor performer on tests; she further explained that these symptoms caused her problems in her past work performance. While she reported feeling sad or frustrated at times when she failed to accomplish a task, she did not perceive herself as clinically depressed or in need of counseling, as she felt she was dealing with her situation as best as could be expected.

On mental status examination Dr. Kramer observed that Sitcler was adequately dressed and groomed, appeared well oriented, and in good contact with reality without evidence of any thought disorder. She exhibited dull normal intelligence consistent with her past intellectual evaluations, and her affect was pleasant and normal, with no evidence of any emotional distress. Although she was an adequate informant, she was somewhat disjointed, disorganized, and vague in her verbal presentation. Dr. Kramer noted that she had some mild cognitive problems, as her short-term memory and attention span were weak at times; however, her social skills appeared normal.

As to her daily activities, Sitcler reported to Dr. Kramer that she cooks, cleans, does laundry, shops, cares for her two sons,[5] and drives a car, although she stays at home most of the time. She reported feeling disorganized in her financial affairs, relying on assistance for these activities from her friend with whom she lives. In terms of interpersonal functioning, Dr.

---

[5] Sitcler reported that she has joint custody of her two sons, ages eleven and thirteen, and that her older son resides with her most of the time, while her younger son lives primarily with his father.

Kramer commented that Sitcler was pleasant, cooperative, and seemed to interact well with others. He concluded that she had the ability to function independently, although her capacity to sustain complex activities might be somewhat weak because of her dull normal intellectual functioning and possible attention deficit disorder. He diagnosed Sitcler with a Probable Attention Deficit Disorder and assigned her a Global Assessment of Functioning (GAF) score of seventy.[6]

In conjunction with Sitcler's work history report dated September 25, 2000, Sitcler's former employer reported that Sitcler remembered locations and work procedures, could understand and carry out simple procedures, was able to concentrate on her assigned work, and exhibited adequate punctuality and attendance. She further relayed that Sitcler worked independently and at a consistent pace, got along with others, and did not require special consideration to perform her job.

On June 13, 2001, at the request of the Office of Vocational Rehabilitation, Dr. James Cates, a clinical psychologist, performed a psychological evaluation of Sitcler. In the evaluation Dr. Cates observed that Sitcler was casually dressed and adequately groomed, cooperative, and showed minimal signs of anxiety; her affect and mood were pleasant, her speech articulate, and her language expression reasonably well developed. She readily comprehended the instructions for all tasks, and her focus and flow of verbal interaction was appropriate; however, she demonstrated at times a low frustration tolerance and some impulsivity. Overall, Dr. Cates

---

[6]Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). A GAF score of seventy means an individual experiences some mild symptoms or some difficulty in social, occupational, or school functioning, but generally is functioning pretty well and has some meaningful personal relationships. *Id*.

4

considered her work style efficient.

In the evaluation Sitcler reported to Dr. Cates that she had no history of physical abuse, but did state that she had been sexually abused by a babysitter as a child.  She also confided that in 1998 she had been sexually assaulted, and her assailant recently went on trial; however, she conveyed that she experienced no depression beyond what would be expected given her recent trauma.  Rather, Sitcler described a feeling of high anxiety, perceiving herself as a "high-geared person" who always needs something to do.  As to her career interests, Dr. Cates found that she would likely find satisfaction in creative, self-expressive jobs and dissatisfaction with positions that required interaction with others, as her response style suggested a very strong element of turning away from people.  However, Dr. Cates also commented that Sitcler expressed little interest in the majority of employment opportunities available to her.

Dr. Cates concluded that Sitcler probably had a Generalized Anxiety Disorder of relatively long duration which was overlaid by more recent posttraumatic stress secondary to her sexual assault, together with Schizoid Personality traits; he assigned her a GAF score of seventy-five.[7]  While he considered it unlikely that she would be successful in obtaining an associate degree, he thought she may be able to return to school for a certificate of specialized training in a program which she enjoyed, emphasizing that she would do best at employment which did not require her to interact with others.

On January 24, 2002, Dr. Kramer did a second psychological evaluation of Sitcler at the request of the Disability Determination Bureau.  In the evaluation Sitcler reported that her main

---

[7]A GAF score of seventy-five means if an individual experiences symptoms, they are transient and expectable reactions to psychosocial stressors, and the individual has no more than a slight impairment in social, occupational, or school functioning. *Id.*

work impairment was physical in nature and that her learning disability had caused her some problems in her past job; she denied experiencing any emotional difficulties, stating that she was in a good mood most of the time. On mental status examination Dr. Kramer observed that Sitcler was adequately dressed and groomed, was well oriented, and showed no evidence of any thought disorder. He noted that his evaluation results were consistent with Sitcler's previous test findings, which indicated that she was functioning at the high end of the borderline range of intelligence. Her affect was normal, but she did exhibit a low level of energy and reported significant sleep disturbances. Her social skills and ability to establish rapport appeared to be good. She reported some difficulties in past work because of her poor concentration and focus on detail; Dr. Kramer hypothesized that her cognitive problems may be due to her borderline intellectual functioning and chronic fatigue.

As to her daily activities, Sitcler reported to Dr. Kramer that she was currently taking four classes at Ivy Tech and was doing fairly well academically. She stated that when she was not in school, she spent her time performing household chores, caring for her children, and keeping her medical appointments. Although she reported functioning independently, she had no hobbies or interests, feeling that she had no time for them. Dr. Kramer found that she had the ability to function independently, although her ability to sustain complex activities would be considered poor because of her chronic fatigue and borderline intelligence. He assigned a diagnosis of Borderline Intellectual Functioning and a GAF score of seventy.

On January 27, 2003, Carlene McClurg, a nurse practitioner under the supervision of Dr. Kevin Murphy, evaluated Sitcler. Sitcler was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), a mood disorder, and a learning disability, and was assigned a GAF rating of

sixty.[8]  Concomitant with medication management, Sitcler was referred to Dr. Jason Cook, a clinical psychologist, for therapy due to her anxiety problems.

On her first visit with Dr. Cook on February 14, 2003, Sitcler explained that she perceived herself as paranoid because of the sexual assault she experienced in 1998, reporting that when she sees police officers, she has an increased sense of anxiety that at times becomes overwhelming, manifesting as a "killer" feeling in her chest, tense muscles, shortness of breath, and intense fear.  Dr. Cook noted that as a result of the sexual assault, Sitcler no longer went to bars, socialized outside her family, or worked, and had decreased self confidence, worrying excessively over the welfare of close family members.

On April 9, 2003, at Sitcler's request, Dr. Cook sent a letter to Sitcler's attorney regarding her mental status, which stated that her condition "has been quite disabling," and that she "feels unable to work outside the home."  He estimated that Sitcler would require an additional one to three years of treatment.

On July 18, 2003, after twelve sessions with Dr. Cook, Sitcler reported that her anxiety symptoms had reduced to a one or two on a one-to-ten scale, and that she no longer experienced panic or phobic reactions to specific environmental factors.  Dr. Cook concluded that a combination of medication and psychotherapy had been effective in helping Sitcler currently manage her anxiety, although he was not convinced that it was a lasting change overall.  Nonetheless, because of her substantial progress, Dr. Cook decided to reduce the frequency of

---

[8] A GAF score of sixty means an individual experiences moderate symptoms or has moderate difficulty in social, occupational, or school functioning. *Id.*

7

Sitcler's sessions to once per month.[9]

On October 31, 2003, at the request of Sitcler's attorney, Dr. Cook completed a Medical Impairment Questionnaire and a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on behalf of Sitcler. He reported Sitcler's diagnosis as Posttraumatic Stress Disorder and ADHD - Inattentive Type, with Avoidant and Dependent Personality traits, and listed Sitcler's symptoms as follows: poor memory; sleep disturbances; perceptual disturbances; personality change; mood disturbances; decreased energy; persistent irrational fears; hostility and irritability; feelings of guilt and worthlessness; oddities of thought, perception, speech, or behavior; social withdrawal or isolation; recurrent panic attacks; anhedonia; intrusive recollections of a traumatic experience; paranoia or inappropriate suspiciousness; pathological dependence or passivity; and difficulty thinking or concentrating. He assigned Sitcler a GAF score of fifty to fifty-five[10] and clinically found that Sitcler had: (1) a severely restricted sphere of influence due to stress reactions of chronic traumatic experience; (2) nightmares and flashbacks, which lead to panic symptoms, emotional deregulation, and poor judgment; and (3) no active social life, which would likely be even more reclusive if she did not have parenting responsibilities. He stated that although his treatment intervention with Sitcler had been successful, her symptoms remained prominent, significant, and interfering. He summarized that her prognosis was fair to good, but that more treatment was necessary to continue her progress and insure success. Dr. Cook hypothesized that without further treatment Sitcler would likely

---

[9]The last progress note from Dr. Cook in the record is dated July 18, 2003; it is unclear whether Sitcler actually attended any additional sessions with Dr. Cook.

[10]A GAF score of fifty to fifty-five means an individual experiences serious or moderate symptoms or has a serious impairment or moderate difficulty in social, occupational, or school functioning. *Id.*

regress and her functional capacity would reduce.  He further projected that her psychological impairments would likely cause her to be absent from work more than four days a month, and if she were to return to full-time work, her stress would increase and a strong possibility existed that her mental functioning would decline.

At the hearing with the ALJ, Sitcler testified that she lived with her children and friend, did housework, cooked, shopped for food, used a computer, drove a car, read a great deal, socialized with friends, and visited her sister.  Sitcler reported that she had not attempted to go back to work after losing her last job in 2000:

> Q   Have you attempted to go back to work after Adeco?
>
> A   No.  I decided to go back to school.

(Tr. 48.)  At the time of the hearing, Sitcler was pursuing an associate degree in desktop publishing on a full-time basis at Ivy Tech State College, receiving grades that ranged from B to D.  Sitcler reported she had not missed any school in the most recent semester and that she got along well with people at school, although in prior semesters she took some classes from home via computer, as she was most successful when working at her own pace.

A vocational expert ("VE") testified at the hearing that an individual having limitations comparable to Sitcler could perform her past relevant work as a document preparer, as well as about 950 other jobs in the region; however, he further testified that an individual who missed work more than four days per month could not sustain gainful competitive employment.

In his decision the ALJ found that Sitcler retained the residual functional capacity ("RFC") set forth *infra* in Section IV(B), and determined that she was not disabled.

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV. DISCUSSION

*A. Legal Framework*

To be considered disabled under the Social Security Act, a claimant must establish that he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App.

1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[11]  20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision and Sitcler's Arguments

In this case, the ALJ determined that there was insufficient evidence to determine when Sitcler had last performed substantial gainful activity; therefore, he proceeded to step two of the sequential evaluation process. (Tr. 17.)  At step two, he found that Sitcler had a severe impairment, and at step three, that Sitcler's impairment did not meet or exceed any of the impairments listed by the Commissioner. (*Id.*)  Hence, the ALJ proceeded to step four. (Tr. 18.)

After a thorough discussion of the medical evidence and lay testimony, the ALJ found the following RFC for Sitcler:

> The claimant has the residual functional capacity to perform unskilled work at the sedentary exertional level. She has a working memory of 82 (which is in the low average range).  In addition, the claimant has been assigned GAF scores ranging from 65 to 70.  In an eight-hour period, she is able to stand/walk for a total of at least two (but not six) hours and sit for a total of six hours.  She is able to lift and carry ten pounds occasionally and less than ten pounds frequently.

(Tr. 25.)  Based on this RFC, the ALJ concluded that Sitcler could perform her past work as a

---

[11]Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

document preparer, as well as certain other work available in the national economy, such as a surveillance system monitor, charge account clerk, order clerk, or call out operator. (Tr. 24.) Therefore, the ALJ determined that Sitcler was not disabled and, thus, not entitled to DIB or SSI payments. (Tr. 25.)

Sitcler now argues that the ALJ's ruling should be overturned because the ALJ improperly rejected the opinion of Dr. Cook, Sitcler's treating psychologist. (Opening Br. at 21.) Sitcler's argument, however, is unpersuasive.

### C.  The ALJ's Decision to Assign Little or No Weight to Dr. Cook's Opinion Is Supported by Substantial Evidence

Dr. Cook stated that Sitcler's condition was "quite disabling," and that her return to full-time work would likely interfere with her mental functioning and result in her missing work more than four days per month. (Tr. 436, 586.)  However, the ALJ assigned little or no weight to Dr. Cook's opinion, stating that "it [was] not consistent with the objective medical evidence nor [was] it consistent with her daily activities, which include taking college courses on a full-time basis, cooking, and doing housework." (Tr. 22.)  Sitcler argues that the ALJ's rejection of Dr. Cook's opinion was improper.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.

12

2002); 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).  Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner, *id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. § 404.1527(e)(1); 20 C.F.R. § 416.927(e)(1).  Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2).

     Sitcler first argues that any inconsistencies existing between Dr. Cook's opinion and that of the other examiners are justified, because only Dr. Cook "discovered her anxiety problems and how they impacted on her functioning." (Opening Br. at 22.)  However, this argument patently lacks merit, as Dr. Cook himself provided evidence that other evaluators considered Sitcler's anxiety, by recording in his progress note that "[s]ome of the past reports lean to anxiety disorder and posttraumatic stress symptoms . . . ." (Tr. 552.)  More specifically, Dr. Cates diagnosed Sitcler with a Generalized Anxiety Disorder overlaid by posttraumatic stress

secondary to her sexual assault, noting that Sitcler would be most successful in employment where she is not required to interact with others.  Therefore, Sitcler's argument that Dr. Cook discovered new evidence about the nature and extent of her mental impairments, evidence that all other prior examiners failed to see, is flatly unconvincing.

Second, Sitcler asserts that the ALJ erred by rejecting Dr. Cook's opinion because of Sitcler's (1) GAF score inconsistencies, and (2) improvement with treatment.  However, contrary to Sitcler's argument, opinions which are not well supported by medical evidence and which are inconsistent with other evidence in the record are *exactly* the opinions which an ALJ should discount. *See Roberts v. Shalala*, 66 F.3d 179, 184 (7th Cir. 1995) (affirming ALJ's rejection of a physician's reports where they were "in irreconcilable conflict").  Dr. Cook's application of a GAF score of fifty to fifty-five is not particularly well supported by his own progress notes, which state that Sitcler made substantial improvement throughout his twelve sessions with her – improvement to the point of his reducing the frequency of her sessions with him to once per month.  Additionally, Sitcler's performance of her activities of daily living ("ADL"), including attending and completing four college classes in the fall semester of 2003 with perfect attendance, does little to substantiate a serious or moderate mental impairment level.  To the contrary, the record as a whole supports the GAF scores and opinions given by Dr. Cates and Dr. Kramer – that Sitcler has a mild mental impairment and would do best in employment where she is not required to interact with others.

The Seventh Circuit has stated:

> [I]t is up to the ALJ to decide which doctor to believe -- the treating physician who has experience and knowledge of the case, but may be biased, or ... the consulting physician, who may bring expertise and knowledge of similar cases -- subject only to the requirement that the ALJ's decision be supported by

14

substantial evidence.

*Books*, 91 F.3d at 979 (quoting *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). Here, the ALJ acknowledged in his decision that Dr. Cook was Sitcler's treating psychologist and that he reviewed Dr. Cook's progress notes pertaining to Sitcler; however, in reviewing all of the evidence, the ALJ concluded that the opinion given by Dr. Cook in response to requests from Sitcler's attorney was inconsistent with the evidence in the record as a whole. Therefore, the ALJ's decision to assign little or no weight to Dr. Cook's opinion is supported by substantial evidence, and Sitcler's second argument fails.

Third, Sitcler argues that the ALJ erred when determining that Sitcler's ADL performance was inconsistent with Dr. Cook's opinion that, if Sitcler returned to full-time work, she would miss work more than four days per month due to her mental condition. But the ALJ's determination was more nuanced than Sitcler makes it seem. The ALJ simply stated that Dr. Cook's opinion – that Sitcler's condition was "quite disabling" and merited a GAF score of fifty to fifty-five – was inconsistent overall with much of the objective evidence, including (1) the evaluations by other examining psychologists showing higher GAF scores; (2) Dr. Cook's own progress notes denoting Sitcler's substantial progress and reduced anxiety; and (3) Sitcler's ADL performance. "Nothing . . . mandates that the opinion of a treating physician always be accepted over that of a consulting physician, only that the relative merits of both be duly considered." *Books*, 91 F.3d at 979. Therefore, after considering the merits of all of the medical evidence in the record, the ALJ chose to assign little or no weight to Dr. Cook's opinion, and his decision to do so is supported by substantial evidence.

Next, Sitcler argues that the ALJ failed to consider a number of other factors when he

rejected Dr. Cook's opinion: (1) the duration of Sitcler's treatment with Dr. Cook; (2) Dr. Cook's review of all of the medical evidence, in contrast to other consulting psychologists who allegedly failed to do so; and (3) the lack of evidence to support, as well as the lack of explanation in, the opinions of the non-examining state agency psychologists.  However, contrary to Sitcler's assertions, once the ALJ determined that Dr. Cook's opinion was not entitled to controlling weight because they were inconsistent with the record, the ALJ did properly consider the factors required by 20 C.F.R. § 404.1527(d) and 20 C.F.R. § 415.927(d). First, he referred to Dr. Cook in his determination as Sitcler's "treating psychologist," showing proper deference to his treating status and his specialty. (Tr. 21-22.)  Second, it is clear that Dr. Cook considered the length, nature and extent of Dr. Cook's relationship with Sitcler, because of his reference to, and consideration of, Dr. Cook's progress notes and other communications:

> Progress notes since January 2003 from Parkview Behavioral Health reveal that the claimant was assigned a GAF score of 60 in early 2003.   She was noted to have a learning disability but no deficit in communication skills.  By June 2003, these records indicate that the claimant's school grades had improved and that her anxiety was improving.  Dr. Cook added that the claimant had greatly improved coping skills.  In July 2003, the claimant told Dr. Cook that she was getting better; he noted that her self-confidence was improved.

(Tr. 21).  Third, as discussed *supra*, the ALJ noted that Dr. Cook's opinion delivered in response to Sitcler's attorney's request was inconsistent with, and not well supported by, the medical evidence submitted by other psychologists and Sitcler's ADL performance.

The Seventh Circuit has held:

[T]he ALJ must take into account the treating physician's ability to observe the claimant over a longer period.  However, while the treating physician's opinion is important, it is not the final word on a claimant's disability. . . . The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.  The regular physician also may lack an appreciation of how one case compares with other related cases.  A

16

consulting physician may bring both impartiality and expertise.
*Books*, 91 F.3d at 979 (internal citations and quotation marks omitted).  While the ALJ has a duty to "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability," he is not required to "provide a written evaluation of every piece of evidence that is presented." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  Here, the ALJ met the burden of minimal articulation.  He described the evidence in the record in relation to Dr. Cook's opinion, weighed that evidence, and concluded that Dr. Cook's opinion should be given little or no weight in his decision.[12]  It is not this Court's function to reweigh the evidence or substitute its judgment for the ALJ's. *Clifford*, 227 F.3d at 869.

As to Sitcler's argument that Dr. Cook was the sole professional who reviewed all of the medical evidence relating to her mental condition, Sitcler provides solely a single progress note written by Dr. Cook to support her argument, which states that "[s]everal of the professionals who did not pick up on the anxiety did not have an adequate history relating to past abuse perpetrated against Cathy." (Tr. 552.)  Quite to the contrary, as discussed *supra*, Dr. Cates specifically referred to Sitcler's past history of abuse in his evaluation summary; therefore, Sitcler's argument is baseless.  Sitcler's next contention – that the ALJ's decision should be overturned because of the poor supportability of the non-examining state agency psychologists' opinions – is unpersuasive as well; although the ALJ did mention that such psychologists' opinions were inconsistent with Dr. Cook's opinion, he ultimately rejected them as well in

---

[12]While the ALJ used the term "rejects" in his determination, the correct term to be applied with respect to a treating source's medical opinion is the "weight" assigned to such opinion.  *See* SSR 96-2p: Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions at 4 (July 2, 1996).  Nonetheless, it is clear here that the ALJ considered the factors required by 20 C.F.R. § 404.1527(d) and 20 C.F.R. § 416.927(d) and, thus, his use of the term "rejects" does not imply that his conclusion was faulty.

17

reaching his decision, relying on other objective medical evidence such as Dr. Cates's and Dr. Kramer's opinions. (*See* Tr. 22, 23.)  Therefore, Sitcler's attempt to overturn the ALJ's decision on these grounds also fails.

Finally, Sitcler, citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996), argues that the ALJ erred by "playing doctor," substituting his own judgment for that of Dr. Cook's.  However, in *Rohan*, the court reversed and remanded the case because it was "unable to discern how -- apart from substituting his own judgment for that of the medical witnesses -- the ALJ reached his determination regarding the degree of Rohan's impairments . . . ." *Id.* at 971.  Here, in contrast to *Rohan*, the ALJ made it clear in his determination that he relied on other objective medical evidence in making his decision – such as Dr. Cates's and Dr. Kramer's opinions – in addition to Sitcler's ADL performance.  Therefore, Sitcler's final argument comes up short as well.

## V.  CONCLUSION

In summary, for the reasons stated herein, the ALJ's finding that Sitcler was not disabled, and thus not entitled to DIB or SSI payments, is supported by substantial evidence.  Therefore, the Commissioner's final decision is hereby AFFIRMED.

Enter for this 20th day of May, 2005.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge